UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

DAVID HARRIMAN,              )
                                )
           Plaintiff         )
                                )
        v.                )     Civil No. 08-122-B-W
                                )
HANCOCK COUNY, et al.,     )
                                )
          Defendants     )

**RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT**

David Harriman is pressing civil rights and tort claims arising from his treatment at the Hancock County Jail after his arrest on October 2006. Harriman acknowledges that he was severely intoxicated when he was arrested and concedes that he does not have a memory of almost everything that occurred during key periods of the events in question because of his inebriation. On his release from the jail, David Harriman had two black eyes, an abrasion to his forehead over his right eye, an abrasion to the bridge of his nose, and numerous abrasions to the very top of his head. Harriman does not have a designated expert to testify on the question of how he received these injuries.

The defendants Hancock County, William Clark, Ryan Haines, Heather Sullivan, Michael Pileski, Karen McCarty, and Troy Richardson have moved for summary judgment. In defending this motion for summary judgment Harriman focuses on a theory that he was not in the holding cell the defendants claimed he was in at the time they said he was but was in the booking area. He also maintains that Harriman was not in a suicide smock during the time the defendants testified he was. Harriman asserts that the jail's daily log seems to be "fake and untrustworthy." He relies on the affidavits of the Emergency Medical Technician, Jenny Sheriff,

called to the jail to respond to Harriman's condition and a fellow inmate, Foster Kane, who

claims he heard a beating taking place in the area that Harriman maintains he was held.

According to Harriman: "Discovery has been unable to support Plaintiff's Count II, False

Arrest and Imprisonment and Count IV, Conspiracy Claims, under 42 U.S.C. Sec. 1985. As a

result, Plaintiff relinquishes his claims to those two Counts." (Resp. Mot. Summ. J. at 1.) With

regards to these and all the remaining counts I recommend that the Court grant the defendants'

motion for summary judgment.

<u>Discussion</u>

Summary judgment "should be rendered if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant[s are] entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).   I

"draw the relevant facts from the summary judgment record and rehearse them in the light most

flattering to" Harriman.  <u>Bergeron v. Cabral</u>, __ F.3d __, __, 2009 WL 580795, 1 (1st Cir. Mar.

9, 2009)  (citing <u>Cox v. Hainey</u>, 391 F.3d 25, 27 (1st Cir.2004)).

*A.*     ***REQUEST TO STRIKE***

The defendants have responded to Harriman's efforts to dispute their factual presentation

by moving to strike.  They focus particularly on the affidavits of Emergency Medical Technician

Jenny Sheriff and inmate Foster Kane.  (<u>See</u> Doc. No. 47.)

Local Rule 56(e) specifies:

> Motions to strike statements of fact are not allowed. If a party contends
> that an individual statement of fact should not be considered by the court, the
> party may include as part of the response that the statement of fact "should be
> stricken" with a brief statement of the reason(s) and the authority or record
> citation in support. Without prejudice to the determination of the request to strike
> the party shall admit, deny or qualify the statement as provided in this rule. A

> party may respond to a request to strike either in the reply statement of material facts as provided in this rule or, if the request was made in a reply statement of material facts, by filing a response within 11 days. A response to a request to strike shall be strictly limited to a brief statement of the reason(s) why the statement of fact should be considered and the authority or record citation in support.

Dist. Me. Loc. R. 56(e).

The defendants ask the court to strike the affidavits of Sheriff and Kane and all the

statements of facts reliant thereon, explaining:

> Plaintiff's Response to Defendants' Statement of Material Facts and Plaintiff's Additional Statement of Material Facts relies in large part on the affidavits of Jenny Sheriff and Foster Kane. The Court should disregard these affidavits and all facts and denials based upon them because these witnesses were never disclosed to Defendants. Plaintiff's Complaint was filed on March 15, 2008. Plaintiff provided his initial disclosures on July 30, 2008, and his Answers to Defendant's Interrogatories are dated September 12, 2008. None of these documents identify either Jenny Sheriff or Foster Kane.
>
> The discovery deadline was December 3, 2008. On January 15, 2009, Defendants' filed their Motion for Summary Judgment. Plaintiff's response was originally due February 5, 2009, but he was given an extension until February 19, 2009, to file his response. On February 17, 2009, Plaintiff's counsel sent a letter to Defendant's counsel advising him of two new witnesses and supplementing his initial disclosures. *Exhibit A*. In this letter Plaintiff's counsel advised that he had hired a private investigator to locate these witnesses. Undersigned counsel quickly faxed a letter to Plaintiff's counsel asking for additional information about *when* this private investigator had been hired in order to determine if the private investigator had been hired prior to the close of discovery. *Exhibit. B*. Plaintiff's counsel did not respond to this letter. Under Fed.R.Civ.P. 37(c)(1)
>
> > If a party fails to provide information or identify a witness as required by rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.
>
> This is a self-executing sanction that applies to evidence used in a summary judgment motion. Fed. R. Civ. P. 37*, advisory committee's note* (1993). "[T]he . . . rule clearly contemplates stricter adherence to discovery requirements, and harsher sanctions for breaches of this rule, and the required sanction in the ordinary case is mandatory preclusion." Klonoski v. Mahlab, 156 F.3d 255 (1st Cir. 1998). In this case, the identification of these two witnesses after Defendants have filed a motion seeking summary judgment on all counts and just two days before Plaintiff's reply was due is not justified and is not harmless. The Plaintiff had almost nine months from the time the complaint was filed to the close of

discovery. Plaintiff had information to identify and find these witnesses prior to
the close of discovery, and has failed to justify his failure to do so.

(Reply SAMF at 1-2.)

The defendants filed this pleading including the request to strike on March 9, 2009.

Harriman had until March 20, 2009, to respond with his brief statement. On March 20, Harriman

filed a motion to file a surreply indicating that the defendants objected to this request.  In this

motion he offers rather contradictory reasons for allowing the affidavits as support for his

defense of the motion -- at one point arguing that he could not have obtained these

affidavits/disclosed these witnesses earlier and then arguing that the EMT report (by Sheriff) and

the identity of Foster Kane were available to the defendants through discovery. On March 23,

2009, I held a telephone conference on this issue and Harriman's attorney was given until March

25, 2009, to file an affidavit in support of his position.

Harriman has responded by filing three affidavits and a memorandum in response to the

motion to strike.  (See Docket No. 51.) The discovery deadline was December 3, 2008.  In the

affidavit of the investigator, Charles Graham, Graham represents that he was contacted on

January 5, 2009, by Harriman's counsel with regards to this case.  (Harriman Aff. ¶ 1, Doc. No.

51-4.)  Graham did not start work on the case until January 8, 2009. (Id. ¶ 2; Pl.'s Resp. Request

Strike at 2.)

In his March 25, 2009, memorandum Harriman contends that he was "lulled into the

belief that there was no one to corroborate Trooper Gregory Mitchell's version of the facts, which

stood in stark contrast to those of the Defendants."  (Pl.'s Resp. Request Strike at 1.)    He claims

that it was only after taking the depositions of "various" defendants that Harriman and his family

began a "diligent search in the Hancock County area for other inmates incarcerated with the

Plaintiff over the weekend of October 20, 2006."  (Id.)

The Mitchell Deposition was taken on October 9, 2008; Heather Sullivan's on November

6, 2008; Ryan Haines's on November 6, 2008;  Alvin Cohn's on November 24, 2008; Michael

Pileski's on December 29, 2008; and Crystal Hobbs's on December 29, 2008.[1]

Harriman relates:

> Even prior to that, Plaintiff and his family had attempted to find one
> inmate in particular, Foster Kane. The reason for seeking out Mr. Kane was that
> coincidentally, he was a first cousin of the Plaintiff's wife, Danielle Harriman.
> We learned through discovery that Mr. Kane was incarcerated in Cell Block A.
> And we learned through discovery that at some point over the weekend Mr.
> Harriman was placed in Cell Block A with Mr. Kane.
> Mr. Kane's first contact with his cousin, Danielle Harriman, led her to
> believe that Plaintiff was beaten by the guards and not a victim of an intoxication
> induced fall as reported by the various Defendants. Plaintiff and his wife,
> Danielle, attempted to contact Mr. Kane through Mr. Kane's sister and also, his
> mother and father. Though they looked for him throughout the summer and early
> fall of 2008, they were unable to find Foster Kane. See Affidavits of Danielle
> Harriman (Exhibit A) and David Harriman (Exhibit B).

(Id. at 1-2.)

In the Graham Affidavit the relevant paragraphs are as follows:

> 9. On 2/7/09 I received information that Foster Kane had left for Florida for about
> 3 weeks.
> 10. On 2/10/09 I proceeded to the County Ambulance Service in Ellsworth to
> attempt to locate Paramedic Jenny Sheriff and EMT Leyendecker. Jenny Sheriff
> now lives in Southern Maine.
> 11. On 2/13/09 I spoke with and interviewed Leyendecker on phone.
> 12. On 2/16/09 I spoke with Foster Kane on the phone and determined that his
> Florida trip had been cancelled.
> 13. On 2/17/09 I made arrangements to meet with Foster Kane to prepare an
> affidavit. Kane failed to appear.

---

[1]       I would assume that the parties agreed to complete some depositions post discovery deadline.  While I understand that practice may be widespread and in many cases it is not necessarily an evil thing, the parties must understand that they engage in such agreed-to post discovery events at their peril.  The court's deadlines have not shifted nor has discovery been enlarged because the parties' personal schedules prevented the completion of discovery by the appointed deadline.

14. I spoke with Kane again, made arrangements to meet later in the evening for the affidavit. Kane failed to appear again.
15. On 2/18/09 I made arrangements for affidavits to be signed by Kane and Sheriff.

(Graham Aff. ¶¶ 9-15.)

This complaint was filed on April 15, 2008.  The events in question occurred in October 2006.  In David Harriman's Affidavit in support of the opposition to the request to strike he indicates that he received a copy of the jail log for the Hancock County Jail from his attorney on October 8, 2008.  (David Harriman Aff. ¶ 1, Doc. No. 51-3.)  He relates that he and his nephew and son reviewed this list and were not able to contact any of Harriman's jail co-inhabitants.  (Id. ¶¶ 2-7.) Danielle Harriman represents that she received an October 8, 2008, fax from her husband's attorney asking her to try to identify and find the people incarcerated with her husband on the weekend of October 20, 2006.  (Mar. 25, 2008, Danielle Harriman Aff. ¶ 1, Doc. No. 51-2.)  She explains:

2. David and I met with Mr. Thistle October 26, 2006 and went over the list.
3. Foster Kane, an inmate of the Hancock County Jail on the weekend of October 20, 2006 is my first cousin.
4. Foster Kane wrote me on or about April 30, 2007 and told me that he believed David had been beaten by corrections officers at the Hancock County Jail on October 20, 2006.
5. I sent Foster a letter on May 7th asking him if he would speak to David's attorney about what he knew.
6. Foster never responded to that letter.
7. I knew Foster would be released about May of 2008. At that time I tried to contact him by calling his sister, Audry Kane.
8. I tried Foster's mother and his father at that time, also, but could not find out where Foster was staying.

(Id. ¶¶ 2-8.)[2]

---

[2]    I am a little unsure of Danielle Harriman's dates.  I don't know if she actually heard from Foster Kane in April 2007 or whether she heard from him about a month before his release and around the time this lawsuit was filed in April 2008.   The affidavit says what it says and it says April 2007.  Either way she was on notice of the need for his testimony well in advance of October 2008.

6

"It is true that the scheduling statement dictated that Discovery would be completed by December 17, 2008," Harriman concedes,  but adds:  "Yet it would be a travesty to hold the Plaintiff to a discovery deadline when there is significant competent evidence to lead the Court to conclude that the Defendants engaged in a 'fraud on the Court'."  (Id. at 2.) "One can only conclude," Harriman maintains, "that the impartial observations of Trooper Mitchell corroborated by the impartial recollections of the Emergency Medical Technician, demonstrate that the correction officers were offering false and misleading testimony in their reports as well as in their depositions."  (Id. at 4.) And then remarkably Harriman suggests: "It truly remains to be seen whether an entry of default judgment may be warranted, but it is not out of the question." (Id. at 5.)

Danielle Harriman's affidavit demonstrates that by no later than April 30, 2007, David Harriman had reasons to know that Foster Kane was a potential witness on his behalf.  Nothing in Harriman's response explains why he waited until January 2009 to hire an investigator to try and track down Kane, or Sheriff for that matter.  Harriman presumably had a good faith basis for his allegations when he filed this complaint.  The defendants filed their answer on June 30, 2008, denying the pivotal allegations and putting Harriman on notice that they were contesting their liability.  So it is not credible, to put it mildly,  for Harriman to suggest that he was only made aware of his need to further investigate with the aim of corroborating his theory  after the sequence of depositions in the fall and early winter of 2008.   While Harriman's counsel waxes eloquent with his accusations of "fraud" being perpetrated upon the court by the defendants, he never explains why he was free to disregard the scheduling "statement" and wait until after the close of discovery to even retain the private investigator.  Nor does counsel explain why the private investigator wasted time trying to track down other inmates when Harriman's wife knew

7

that Foster Kane was the person with critical information.  Nor does counsel explain why the defendants' attorney was never informed in plaintiff's initial disclosures or a supplement thereto that Foster Kane was a crucial defense witness who would corroborate Harriman's case.   For all his railing about "fraud" against the court and the injustice of the defendants' conduct, Harriman's counsel offers precious little justification or explanation for his own failure to properly prepare his case and complete discovery in a timely fashion.   I conclude that if the court's scheduling orders are to maintain any credibility at all, defendants' request to strike must be granted.  However, I have discussed the facts including the two stricken affidavits and my conclusion is that even if the affidavits were not stricken, summary judgment would be appropriate on this record.  The Foster Kane affidavit does make the excessive force count, "the unreasonable search and seizure," a closer case, but Kane's affidavit provides little evidentiary support as to the particular actors who might bear responsibility for Harriman's injuries.

**B.     FACTS**

In responding to Harriman's other statements of material fact the defendants have taken a line-item veto approach to the materiality of the additional facts asking the court to strike statements they deem immaterial. I take note of the defendants' position on this score but it is ultimately for the court to make the determination of whether or not a particular statement is material to the legal claims in dispute.

**1.     People**

***a.     Ryan Haines***

Ryan Haines was first hired by the Hancock County Sheriff's Department as a corrections officer on February 1, 2000.  He resigned in February 2003. (SMF ¶ 1; Resp. SMF

¶1.)  Haines was rehired as a corrections officer at the Hancock County Jail in July 2006, and he was in that position at the time of the events in this case. (SMF ¶ 2; Resp.SMF ¶2.) Haines completed the basic corrections course at the Maine Criminal Justice Academy in 2000 which includes training on the use of force. (SMF ¶ 3; Resp.SMF ¶ 3.)

According to the defendants, Haines has been trained on the Hancock County policies and procedures, include policy D-241 (Use of Force), and he received additional training on the use of force at the jail. (SMF ¶ 4; Haines Aff. ¶ 3.)  Harriman responds to this statement with a denial, indicating that the use of force was taught at the Police Academy and not at the Hancock County Jail.  (Resp. SMF ¶ 4; Dannenberg Dep. 62:2-4.)  The defendants counter with a request that this response be stricken because the citation to the Danneberg Deposition does not contest that the Hancock County Jail did not provide use of force training and training on policies and procedures.  (Request to Strike ¶ 4.) I agree with the defendants that the portion of the Dannenberg Deposition cited is pretty vague on the question.[3]  According to the defendants, when Haines was hired and rehired, he was required to review the Policy and Procedure Manual and he did review it. (SMF ¶ 5;  Haines Dep. at 21-22; Haines Aff. ¶ 4.)  Harriman qualifies this assertion by indicating that Haines does not recall what the manual said -- he is pretty sure he reviewed it, but is not positive. (Resp. SMF ¶ 5; Haines Dep. at 22:4-10.)  Since that time, Haines has received training on updates in policies and procedures. (SMF ¶ 6; Resp.SMF ¶ 6.)

On October 20, 2006, Haines worked the night shift from 1700 to 500 the following morning. (SMF ¶ 7; Resp. SMF ¶ 7.)

---

[3]  There is a similar contest over the parallel paragraphs pertaining to the other individuals receiving training set forth below. With respect to those paragraphs the dispute is indicated by citation to the response statement of fact and the corresponding request to strike paragraph.

**b.      *Heather Sullivan***

Heather Sullivan was first hired as a corrections officer at the Hancock County Jail in 2002. She was a sergeant at the time of the events in this case. (SMF ¶ 8; Resp.SMF ¶ 8.) Sullivan completed the basic correction course at the Maine Criminal Justice Academy which includes training on the use of force.  She has been trained on Policy D-241 "Use of Force." (SMF ¶ 9;  Sullivan Aff. ¶ 2.) (See Resp. SMF ¶ 9; Request to Strike ¶ 9.) On October 20, 2006, Sullivan was working from 1700 to 500 the next day. (SMF ¶ 10; Resp.SMF ¶ 10.) Sullivan was the supervisor on duty during that shift. (SMF ¶ 11; Resp.SMF ¶ 11.)

**c.      *Michael Pileski***

Michael Pileski was hired as a corrections officer at the Hancock County Jail in December 2005. (SMF ¶12; Resp. SMF ¶ 12.) When Pileski was hired he was trained on policies and procedures at the jail, including Policy D-241(use of force). (SMF ¶ 13; Pileski Aff. ¶ 2.) (See Resp. SMF ¶ 13; Request to Strike ¶ 13.)  On October 20, 2006, Pileski worked from 1700 to 500 the following day. (SMF ¶14; Resp.SMF ¶ 14.)

**d.      *Karyn McCarty***

Karyn McCarty was hired in September 2001. (SMF ¶15; Resp.SMF ¶ 15.)  McCarty completed the basic corrections school at the Maine Criminal Justice Academy which included training on the use of force. (SMF ¶16; Resp.SMF ¶ 16.)  McCarty has been trained in Hancock County Policies and Procedures, including D-241 (use of force). (SMF ¶ 17; McCarty Aff. ¶ 3.) (See Resp. SMF ¶ 17; Request to Strike ¶ 17.) McCarty worked the 500 to 1700 shift. Her first

interaction with Harriman was on October 21, 2006, during this shift. (SMF ¶ 18;  McCarty Aff. ¶ 4.)[4]

### e.    *Troy Richardson*

Troy Richardson was first hired as a corrections officer at the Hancock County Jail in 1999. (SMF ¶19; Resp.SMF ¶ 19.)  Richardson completed the basic corrections school at the Maine Criminal Justice Academy in 2000 where he received training on the use of force and he has been trained on Policy D-241, (use of force). (SMF ¶ 20; Richardson Aff. ¶ 2.) (See Resp. SMF ¶ 20; Request to Strike ¶ 20.) At the time of the events in this case Richardson worked the 500 to 1700 shift. He was the supervisor on that shift. He did not have contact with Harriman until his shift began on October 21, 2006. (SMF ¶ 21; Resp.SMF ¶ 21.)

### f.    *Crystal Hobbs*

Crystal Hobbs (who is not a defendant in this action) has worked at the Hancock County Jail since February 2006. (SMF ¶ 22; Resp. SMF ¶ 22.) On October 20, 2006, Hobbs worked the 1700 to 500 shift into the next morning. (SMF ¶ 23; Resp. SMF ¶ 23.) Hobbs was stationed in housing, then went to control, and later in the evening went to the hospital. (SMF ¶ 24; Resp. SMF ¶ 24.)

### g.    *William Clark*

William Clark was the Sheriff of Hancock County at all times pertinent to the allegations contained in this lawsuit. (SMF ¶ 25; Resp. SMF ¶ 25.) As Sheriff of Hancock County, William Clark was the final decision maker at the Hancock County Jail. (SMF ¶ 26; Resp. SMF ¶ 26.) According to the defendants, Clark was not at the scene of the incidents which are the subject of

---

[4]    Harriman denies this statement by indicating that McCarty's report "states October 22, 2006."  (Resp. SMF ¶ 18.)  He does not cite to the report in the record nor does he explain how this alleged discrepancy/typo is material.

this suit and did not have any involvement either by participation, direction, or supervision in events that occurred over the weekend of October 20, 2006, with regard to Harriman. (SMF ¶ 27; Clark Aff. ¶¶ 3, 4.)[5]

### 2.    Policies and Customs

There is no dispute that Hancock County Jail has a Policy and Procedure Manual and that there are several copies of the Hancock County Jail Policy and Procedure Manual located in the jail for corrections officers to review and consult. (SMF ¶¶ 28,29; Resp. SMF ¶¶ 28, 29.) According to the defendants, all jail staff are trained in the policies and procedures contained in the Hancock County Jail Policy and Procedure Manual. (SMF ¶ 30; Clark Aff. ¶ 7.) (See Resp.SMF ¶ 30; Reply SMF ¶ 30.)

When policies or procedures are updated, Jail staff are trained on those updates. (SMF ¶ 31; Resp.SMF ¶ 31.) Hancock County Jail Policy No. D-241 entitled "Use of Force" is the official policy and procedure of the Hancock County Jail regarding the use of force that was in effect on the date of the incident in this lawsuit. This policy is contained in the Hancock County Jail Policy and Procedure Manual. (SMF ¶ 32; Resp.SMF ¶ 32.)  No instructions or directions are given to jail staff regarding the use of force that is anyway inconsistent with the contents of Policy D-241. (SMF ¶ 33; Resp.SMF ¶ 33.)  At the Hancock County Jail there are a number of areas where correctional officers work including booking, control and housing. (SMF ¶ 34; Resp.SMF ¶ 34.)

---

[5]      Harriman responds with a denial citing no record support but arguing the applicable law for supervisory liability. (Resp. SMF ¶ 27.)  The defendants move to strike.  (Reply SMF ¶ 27.)

### 3.       Facts Surrounding Harriman's October 2006 Arrest and Detention

On October 20, 2006, a Friday, Gregory Mitchell, a Maine State Trooper (who is no longer a defendant), was asked to respond to the Emergency Room at Blue Hill Hospital in reference to a complaint made about Harriman. (SMF ¶ 35; Resp.SMF ¶ 35.) When Mitchell arrived at the hospital, Harriman had fled the hospital. Mitchell searched the nearby woods, parking lot and streets, but was unable to find Harriman. (SMF ¶ 36; Resp.SMF ¶ 36.) This occurred in the evening when it was pouring rain with high winds. (SMF ¶ 37; Resp.SMF ¶ 37.) A short time later Mitchell was advised that Harriman had returned to the hospital and Mitchell responded to the scene. (SMF ¶ 38; Resp.SMF ¶ 38.) Harriman was soaking wet, he smelled of alcohol, his speech was slurred and he was hard to understand, his statements were sporadic and did not make sense, his eyes were red and bloodshot, he was soaked and covered with mud from head to toe, which he did not seem to notice and he was very unsteady on his feet. (SMF ¶ 39; Resp.SMF ¶ 39.)

Mitchell was advised prior to locating Harriman that Harriman was on bail conditions that prohibited from consuming or possessing alcoholic beverages. (SMF ¶ 40; Resp.SMF ¶ 40.) Mitchell led Harriman outside the hospital and arrested him on charges of violation of bail conditions. (SMF ¶ 41; Resp.SMF ¶ 41.) Harriman was cooperative until after he was arrested and Mitchell began searching him. (SMF ¶ 42; Resp. SMF ¶ 42.)

During the search, Harriman became verbally abusive and repeatedly called Mitchell a "mother fucker," told Mitchell he would "fuck him in the asshole," told him he would "fuck his kids in the asshole and then fucking kill them," and "fucking kill Mitchell" too. (SMF ¶ 43; Resp. SMF ¶ 43.)   Mitchell had difficulty getting Harriman into the cruiser and had to strike him to get him into the cruiser. (SMF ¶ 44; Resp. SMF ¶ 44.) While they were in the

13

cruiser, Harriman spit at Mitchell. Then he essentially passed out in the cruiser until they got to jail. (SMF ¶ 45; Resp. SMF ¶ 45.) Mitchell pulled his cruiser into the sallyport and brought Harriman in to the jail. (SMF ¶ 46; Resp. SMF ¶ 46.)

Harriman arrived at the jail around 8:00 p.m. (SMF ¶ 47; Resp. SMF ¶ 47.) As Mitchell was walking Harriman into the intoxilizer room Harriman stated he was going to have another fit. (SMF ¶ 48; Resp. SMF ¶ 48.) Harriman became extremely agitated and began screaming profanities and struggling against Mitchell's hold. (SMF ¶ 49; Resp. SMF ¶ 49.) Mitchell restrained Harriman until the corrections officers at Hancock County Jail could take custody of him. (SMF ¶ 50; Resp. SMF ¶ 50.) Harriman appeared to be alternatively polite and cooperative and then aggressive. (SMF ¶ 51; Resp. SMF ¶ 51.) At some point, Mitchell also cited Harriman for terrorizing. (SMF ¶ 52; Resp. SMF ¶ 52.) Harriman was also charged with assault. (SMF ¶ 53; Resp. SMF ¶ 53.) Corrections Officers Haines and Pileski met Mitchell and Harriman and took control of Harriman. (SMF ¶ 54; Resp. SMF ¶ 54.) Harriman was pat-searched. (SMF ¶ 55; Resp. SMF ¶ 55.)

There is some dispute as to the following. According to the defendants, Harriman was taken into the nurse's station where he was asked questions in order to determine if he was a suicide risk. (SMF ¶ 56; Haines Dep. at 32-33.) Haines asked Harriman if he was thinking about suicide, if he had ever attempted suicide or had anyone in his close family attempt suicide, and if he was seeking mental health services. Harriman did not answer any of these questions. (SMF ¶ 57; Haines Dep. at 32-33.) Because Harriman did not answer the questions relating to whether he was a suicide risk, he was put in a suicide smock as the officers could not determine if he was suicidal or not. (SMF ¶ 58; Haines Dep. at 36, 38; Sullivan Dep. at 16.)

14

Because Harriman was unable to answer the booking questions when he first arrived, a corrections officer entered as much information as he could and then the booking forms would be completed at a later time when Harriman was able to answer the questions. (SMF ¶ 59; Haines Dep. at 37; Haines Aff. ¶ 7.)  Because Harriman was being held on a charge of violating conditions of release, he was not eligible for bail through a bail commissioner, but had to wait until he could be brought before a judge. (SMF ¶ 60; Sullivan Aff. ¶ 4.) After being changed into the suicide smock, Harriman, according to the defendants, was moved to HD-1. (SMF ¶ 61; Haines Dep. at 42.)

Harriman was placed on suicide watch and intoxication watch, and the segregation log was started. (SMF ¶ 62; Sullivan Dep. at 18-19.) After Harriman was taken to HD-1, he lay down and went to sleep. (SMF ¶ 63; Haines Dep. at 65.)  Later that evening Sullivan checked on Harriman when she heard him hollering. From the control room she could see Harriman banging and yelling and he did not have his smock on. (SMF ¶ 64; Sullivan Dep. at 13.) Sullivan saw an abrasion on Harriman's forehead and blood on the bridge of his nose when she was in the control room. (SMF ¶ 65; Sullivan Dep. at 39-40.) Sullivan asked Haines to check on him while she walked around control to meet Haines at the door.  (SMF ¶ 66; Sullivan Dep. at 13, 41; Haines Dep. at 69-70.) When Haines checked on Harriman, Harriman said "don't fuck with me" and pulled his hand back as if to strike Haines. There was a door between Haines and Harriman at that point.  (SMF ¶ 67; Haines Dep. at 70.) After checking on Harriman, Haines went in the hallway with Sgt. Sullivan to talk about what to do next and whether a doctor should be called or he should be taken to the hospital. (SMF ¶ 68; Sullivan Dep. at 30-31; Haines Dep. at 74.) Before Haines and Sullivan could complete their discussion, they heard a thud from Harriman falling. (SMF ¶ 69; Haines Dep. at 74; Sullivan Dep. at 31; Pileski Dep. at 32-33.)  Harriman

15

fell and hit his head on the wall. (SMF ¶ 70; Pileski Dep. at 32-33.) Haines immediately entered

the room to check if Harriman was responsive or not. (SMF ¶ 70; Haines Dep. at 70.) It appeared

to Haines that Harriman was unconscious. Haines checked Harriman's airway to make sure he

was breathing and sternum rubs to see if he had a neck injury. (SMF ¶ 71; Haines Dep. at 70.)

Pileski went to HD-1 to observe and he saw Haines trying to arouse Harriman. (SMF ¶ 72;

Pileski Dep. at 39.) It appeared that Harriman had two seizures. (SMF ¶ 73; Pileski Dep. at 39;

Haines Dep. at 73.) Hobbs was in Control when Harriman fell and hit his head. She was notified

by a supervisor to call an ambulance which she did immediately. (SMF ¶ 74; Hobbs Dep. at 19;

Hobbs Aff. ¶¶ 3, 4.) The ambulance arrived and the ambulance attendants brought a stretcher

from the booking area to HD-1. (SMF ¶ 75; Pileski Dep. at 36-37.)

  Harriman's response to this segment of the statement of facts (Paragraphs 56 through 75)

is partially dependent on the Paragraphs 12 and 14 of the affidavit of Jenny Sheriff, an

emergency medical technician responding to the jail's ambulance call, contested, as explained

above, by the defendants. In that affidavit Sheriff avers: "I recall that I picked Mr. Harriman up

in the observation cell immediately in from the Sallyport in the Booking Room." (Sheriff Aff. ¶

12); "I recall that Mr. Harriman was naked." (id.¶ 13); and "There was no robe or suicide smock

in his cell." (id. ¶ 14). In contesting some of theses facts, Harriman also relies on the depositions

of Gregory Mitchell and Heather Sullivan. In the Mitchell deposition he indicates that Harriman

was, "Certainly not" naked when he saw him in the holding cell. (Mitchell Dep. at 46: 25; 47: 1-

2.) He was asked, "And are you sure as you sit here today that you didn't see Mr. Harriman in a

suicide smock in that room?" (Id. at 48:6-8.) Mitchell responded that he was sure that he was not

in the smock. (Id. at 48:9-11.) During Mitchell's deposition he was shown Officer Haines's

report and he agreed that based on the times in that report, "Harriman was in a suicide smock and in a different part of the jail 40 or 50 minutes before [Mitchell] left." (Id. at 74:1-6.)[6]

In the Sullivan deposition referred to by Harriman she testified when asked if she went out to the entry door to the HDD area and looked in and saw Mr. Harriman naked with an abrasion on his forehead and blood running down the bridge of his nose?, "that she had seen it from 'control.' " (Sullivan Dep. at 40:20-25.)[7]  In response to the question of whether, "Mr. Haines [was] mistaken when he said you called him outside. You had him come out of HD-1?," Sullivan responded, "Right."  (Id. at 40:2-4.)  This is all to contradict the statement that Haines had been in Harriman's cell at the time in question. (Resp. SMF ¶ 67.)  Harriman also urges that Haines's and Pileski's testimony in their deposition about the falls did not include their perception of a "thud," (Resp. SMF ¶ 69; Haines Dep. at 74; Pileski Dep. at 32-33), the sin apparently being in the acoustical omission.

There is no dispute to the following facts set forth by the defendants.  (SMF ¶¶ 76-122; Resp. SMF ¶¶ 76-111, 113-22.)  Medical personnel transferred Harriman to the ambulance and Haines went with Harriman in the ambulance to the hospital.  When they arrived at the hospital Harriman was conscious. Hobbs was sent to the hospital and corrections officer Pittman, who was off duty that night, was called in to go to the hospital to relieve Haines.  At the hospital, Harriman threatened Pittman and Hobbs and both of their families when he found out he was not going to be un-cuffed.

---

[6]     Citing to the booking form and the Washington County Psychotherapy Associates, P.A. Assessment Summary and Crisis Plan, Harriman insists that he was not asked suicide related questions until the next day. (Doc. Nos. 41-2 & 41-3.)

[7]     Harriman seems to be attempting to intentionally cherry-pick the deposition to support his conclusion that Sullivan was at the entry door to the HDD area when she witnessed the forehead and nose damage. (Resp. SMF ¶ 65.)  Harriman also cites to six lines of Sullivan's deposition on Page 74 that deny that there is a code of silence at the jail purportedly supporting the contra-temp that she could not see the secured holding from the control room.

Early in the morning Harriman was released from the hospital and taken back to the Hancock County Jail. When Harriman returned from the hospital he was placed back in cell HD-1 on suicide watch and intoxication watch, and a new segregation log was begun. The following day Richardson called Washington County Crisis to have Harriman evaluated because of his inability to answer the suicide questionnaire the prior evening. Barbara Ames from Washington County Crisis met with Harriman and cleared Harriman from suicide watch.

After Harriman was cleared from suicide watch he was moved to A-Block. Later that day Harriman was brought into the booking area to finish the booking process. This was done by Officer McCarty.[8] On October 22, 2006, Harriman was given Tylenol for a headache. Later, in early afternoon on October 22, 2006, Harriman complained of seeing black spots that were getting bigger and he was seeing double vision. McCarty paged Physician's Assistant Blackadar for medical advice. Blackadar returned the call and advised that Harriman should be placed on medical watch and be watched for vomiting and if Harriman did vomit he should be taken to the hospital. Harriman was moved into HD-2 and placed on medical watch.

McCarty briefed the oncoming shift that PA Blackadar had stated that if Harriman began vomiting he would need to be taken to the hospital. In the early evening on October 22, 2006, there was concern that Harriman may have vomited and he was taken to Maine Coast Memorial Hospital. Harriman was returned from the hospital later that evening.

---

[8]     In his statement of additional facts Harriman sets forth the following. The booking form for David Harriman on the weekend of October 20, 2006, identified no concerns that Harriman was a suicide risk. (SAMF ¶ 135; Dannenberg Dep. Ex.1.) The Suicide Risk Assessment was not done on intake, but was done the following day at 1:35 or 1335 hours, 10/21/06. (No citation for 136 although obviously the booking form) (SAMF ¶ 136; Resp. SAMF ¶ 136.)

On October 22, 2006, State Trooper Mitchell completed a 48-hour hold order to have a magistrate make a determination of probable cause for Harriman. This was presented and signed by a justice of the peace. Richardson and Corrections Officer Harlan escorted Harriman to Ellsworth District Court on October 23, 2006, at approximately 1:23 p.m. He was returned to jail where he was bailed out and released.

### 4.   Defendants' Additional Facts Relating to Harriman's Incarceration

The following facts are also not in contest. Harriman is an alcoholic and was an alcoholic on October 20, 2006. There have been times when Harriman has blacked out from consuming so much alcohol that he could not remember what happened the day before. Harriman has no memory of being brought into the jail on October 20, 2006. Harriman has no memory of any specific corrections officers that he may have encountered or interacted with at the Hancock County Jail on October 20, 2006. Harriman has no memory of where he went or where he was taken in the jail on October 20, 2006, until his release. Harriman has no memory of whether he was searched or what type of searches were done while he was at the Hancock County Jail beginning on October 20, 2006, until his release. Harriman has no memory of what clothing he was wearing when he arrived at the jail or what clothing he may have been changed into while he was at the jail between October 20, 2006, until his release. Harriman has no memory of what cell he was held in or kept in between October 20, 2006, and his release. Harriman does not remember any threats he made to anyone at the jail between October 20, 2006, and his release. Harriman does not remember anything that he said at all to anyone while he was at the Hancock County Jail between October 20, 2006, and his release date.

The only things Harriman remembers from his incarceration at the Hancock County Jail between October 20, 2006, and his release are hearing hollering, echo[e]s of hollering, flashes of light, someone saying "he's had enough or I think that's enough or maybe even that's enough," someone saying they were going to take him to Augusta, smelling urine mixed with cleaning fluid and seeing his wife's cousin. Other than the statements described in the previous paragraph, Harriman does not remember anything else at all that anybody said while he was at the Hancock County Jail between October 20, 2006, and his release.  Harriman does not remember any of the Defendants in this case at all from his stay at the Hancock County Jail between October 20, 2006, and his release. Harriman does not remember anything that any of the Defendants said or did at all between October 20, 2006, and his release.  Harriman does not remember going to the Maine Coast Memorial Hospital from the Hancock County Jail at any time from October 20, 2006, until his release.  Harriman has no memory of anything that happened at the Maine Coast Memorial Hospital from October 20, 2006, until he was released from the jail. Harriman does not remember being released from Hancock County Jail in October 2006. Harriman does not remember how he got home after he was released from jail in October 2006.[9]  Harriman does not remember being struck by anybody at the Hancock County Jail from the time of his admission on October 20, 2006, until the time of his release from jail. Harriman does not recall being struck by any object used or wielded or held by anybody at the Hancock County Jail from October 20, 2006, until the time of his release from jail.  Harriman does not remember falling and striking his head on a wall or floor at the Hancock County Jail at any time between October 20, 2006, and

---

[9]      Harriman's one supported denial of this sequence of facts is his assertion that he knows that his father-in-law brought him home.  (Resp. SMF ¶ 112; Harriman Dep. at 33.)

the time of his release.  Harriman does not know what caused the injuries he sustained at the

Hancock County Jail.

     The defendants insist that Haines, Sullivan, Pileski, McCarty, Richardson, and Hobbs, at

no time struck, kicked, bit or used an object to strike or hit Harriman nor did they see anyone

else strike, kick, hit or use an object to strike or hit Harriman.[10]

     According to the defendants, Harriman does not have an expert witness to testify about

the causation of his injuries. Harriman denies this statement without a record citation. In his

memorandum in opposition to the motion for summary judgment Harriman does refer to the

deposition of  Doctor Stephanie Lash who testified:

> Based on the history from he and his wife, in a general sense I think he
> suffered a severe injury and in a general sense think that he has ongoing health
> problems because of it. So to that extent I have belief in the importance of those
> injuries, but any of the specifics of what went on that evening or the subsequent
> couple of days I really have no opinion about.

(Lash Dep. at 39.)  Harriman has not included any statements of fact that set forth an expert

opinion.  In his opposition memorandum responding to the defendants' motion to strike,

Harriman maintains that Dr. Stephanie Lash is his expert witness. (Pl.'s Opp'n Mot. Dismiss at

18.)  However, Harriman has designated Richard Hines as his expert (see Doc. No. 36-14)[11] but

there is nothing in the record that includes his opinion as to the source of Harriman's injuries.

### 5.   Facts and Issues Raised in Harriman's Statement of Additional Fact

     The defendants are legitimately persnickety when it comes to their review of the etiquette

of Harriman's responses, but in responding to Harriman's statement of additional facts they only

---

[10]    Harriman denies this statement without a record citation.

[11]    Federal Rule of Civil Procedure 56(c) makes it clear that this disclosure material is properly considered as part of the summary judgment record.

offer blanket assertions that the statements should be stricken as immaterial (see Reply SAMF ¶¶ 125-32, 134, 143, 169) and they cite, in the alternative, to deposition testimony sometimes without any explication as to the thrust of the qualification or denial (see Reply SAMF ¶¶ 129, 135, 136). In this respect, neither side has been helpful to the court in terms of funneling these facts into a coherent summary judgment record.

Moving on, there is no dispute that Captain Dannenberg is the Jail Administrator of the Hancock County Jail. (SMAF ¶ 124; Resp.SAMF ¶ 124.) When Captain Dannenberg establishes a jail policy, Sheriff Clark does not have to review it. (Resp. SAMF ¶ 123; Dannenberg Dep. at 13.) As the defendants point out, Dannenberg testified that he is aware of any changes made in the policy. (Reply SAMF ¶ 123; Dannenberg Dep. at 13.)

According to Harriman, Captain Dannenberg does not know if the Hancock County Jail has a checklist for admission and release of inmates. (SAMF ¶ 125; Dannenberg Dep. at 16:20-22.) He does not know if he has some type of inmate screening form on admission to the Jail. (SAMF ¶ 126; Dannenberg Dep. at 17:4-8.) He does not know if there is a form in the Jail which identifies arrestees as having any chemical dependency needs. (SAMF ¶ 127; Dannenberg Dep. at 17:12-14.) Dannenberg does not know if he has a form which on intake identifies inmates or arrestees as having special needs. (SAMF ¶ 128; Dannenberg Dep. Page 17:15-18.) Dannenberg does not know if an inmate files a grievance. (SAMF ¶ 129; Dannenberg Dep. at17:22-24.) He has no knowledge if a form exists determining that a particular arrestee needs restraints. (SAMF ¶ 130; Dannenberg Dep. at 18:15-24.) He does not know a way of determining on arrest whether a new arrestee is in need of any type of restraint. (SAMF ¶ 131; Dannenberg Dep. at 19:1-5.) Dannenberg does not know of a system of ever increasing restraints for arrestees or inmates. (SAMF ¶ 132; Dannenberg Dep. at 19:6-8.) Dannenberg is

22

aware that part of the booking form alerts the booking officer to determine whether an arrestee may or may not be a suicide risk. (SAMF ¶ 133; Resp. SAMF ¶ 133.)  Dannenberg has not reviewed Mr. Harriman's Booking form. (SAMF ¶ 134; Dannenberg Dep. at 19:21-22.)

There is no dispute that Trooper Gregory Mitchell left the Hancock County Jail at approximately 2109 on October 20, 2006. (SAMF ¶ 137; Resp. SAMF ¶ 137.)  According to Harriman, when Mitchell left the Hancock County Jail after the arrest of Harriman, Harriman was in his civilian clothes. (SAMF ¶ 138; Mitchell Dep. at 48:13.)  Harriman was not wearing a suicide smock when Mitchell left the Hancock County Jail.  (SAMF ¶ 139; Mitchell Dep. at 48:9.) Mitchell's memory is that Harriman was not in HD1 from 2027 to the time that he left the Jail at 2109; rather Harriman was in the cell opposite the Booking Room desk. (SAMF ¶ 140; Mitchell Dep. at 86: 17-21.)  There is no dispute that Mitchell has a specific recollection of looking to his left as he exited the perimeter door into the Sallyport and that Harriman was in the cell identified as being opposite the Booking Room desk. (SAMF ¶ 141; Resp. SAMF ¶ 141.) Mitchell remembers that Harriman was wearing dark clothing and specifically remembers that Harriman was wearing a green sweater. (SAMF ¶ 142; Resp. SAMF ¶ 142.)  Mitchell remembers that Harriman was in his regular clothing. (SAMF ¶ 143; Resp. SAMF ¶ 143.)[12]

The defendants note that Mitchell testified that he recalls seeing Harriman in his cell right off of booking, but it is possible that this was not the case when Mitchell finally left the jail because he went out to his car on an earlier occasion and that might have been when he made these observations. Mitchell also testified that he did not know what a suicide smock was. (Resp. SAMF ¶¶ 138, 139, 140; Mitchell Dep. at 82, 87.)

---

[12]    The defendants believe that this statement is immaterial.

Correction Officer Ryan Haines reported seeing Harriman unconscious at 2220 hours. (SAMF ¶ 144; Resp. SAMF ¶ 144.)  Haines reported that he saw Harriman have a seizure at 2222 hours. (SAMF ¶ 145; Resp. SAMF ¶ 145.) At 2224 Harriman had another seizure and Haines reported that the County Ambulance arrived at 2227 hours and took over care of Harriman. (SAMF ¶ 146; Resp. SAMF ¶ 146.)

According to Harriman, although Correction Officer Haines found Harriman unconscious at 2220 and saw two short seizures between then and the time the County Ambulance arrived at 2227, Correction Officer Haines failed to report to the Emergency Medical Technicians that Harriman had experienced seizure behavior. (SAMF ¶ 147; Resp. SAMF ¶ 147 (admit); Sheriff Aff. ¶16.)  Correction Officer Michael Pileski also noticed seizure behavior.  In his report he indicated that each seizure lasted 20 seconds. (SAMF ¶ 148; Resp. SAMF ¶ 148.)  He, too, failed to report the seizure behavior to the EMT Jenny Sheriff. (SAMF ¶ 149; Resp. SAMF ¶ 149 (admit); Mitchell Dep. Ex. 6;  Sheriff Aff. ¶16.)

Defendant Crystal Hobbs was the control officer on duty on October 20, 2006, and she maintained a Suicide Watch Log, though Harriman, Harriman insists, was never identified as a suicide risk by anyone. (SAMF ¶ 150; Booking Form Ex. A.)  As the defendants point out, the booking form does not support the breadth of this statement.  (Resp. SAMF ¶ 150.)  The defendants admit that Hobbs maintained a suicide watch log but assert that this log was also an intox log.  (Id.; Hobbs Dep. at 22.)  They deny that Harriman was never identified as a suicide risk by anyone.  (Resp. SAMF ¶ 150; Haines Dep. at 32-33; Haines Aff. ¶ 7.)

Danielle Harriman was called on Saturday, October 21, 2006, by a Correction Officer named Richardson and informed that her husband would not be allowed to have any visitors over the weekend.  (SAMF ¶ 168; Resp. SAMF ¶ 168.) The correction officer did not inform her that

24

her husband had been injured or that he had been taken to the Maine Coast Memorial Hospital because of the severity of his injuries. (SAMF ¶ 169; Resp. SAMF ¶ 169.) [13] Danielle's husband called her on October 21 and informed her that he thought the guards were trying to kill him. (SAMF ¶ 170; Resp. SAMF ¶ 170.) Her husband informed her that he was losing his vision and that he couldn't stop vomiting. (SAMF ¶ 171; Resp. SAMF ¶ 171.)

After David Harriman's release on Monday, October 23, 2006, Danielle Harriman took photographs of the injuries to David Harriman's face and head. (SAMF ¶ 172; Danielle Harriman Aff. ¶14. )  David Harriman had injuries to his forehead, to the bridge of his nose, and he had two black eyes as well as numerous abrasions on the very top of his head. (SAMF ¶ 173; Resp. SAMF ¶ 173.)  All of these injuries were clearly visible in the photographs which she took on the afternoon of October 23, 2006. (SAMF ¶ 174; Resp. SAMF ¶ 174.)  The defendants qualify that the affidavit did not specify the date the photograph was taken.  (Resp. SAMF ¶¶ 172, 174.) [14]

### 6.     Facts Dependant on the Two Stricken Affidavits

#### a. The Jenny Sheriff Affidavit Dependant Additional Statements

Jenny Sheriff was the Emergency Medical Technician who responded to David Harriman on October 20, 2006, at the Hancock County Jail. (SAMF ¶ 151; Resp. SAMF ¶ 151 (admit); Sheriff Aff. ¶ 2.)  Sheriff responded to what was identified as a head injury from a fall. (SAMF ¶ 152; Resp. SAMF ¶ 152(admit); Sheriff Aff. ¶ 5.)   According to Harriman, Sheriff is certain that the call for the ambulance was not made immediately after the injuries occurred because the blood that was visible on Mr. Harriman's forehead was dried blood. (SAMF ¶ 153; Sheriff Aff. ¶9.)  The defendants respond that the significance of the state of the blood is impermissible

---

[13]      The defendants object to this additional statement on the grounds of materiality.
[14]      The picture is on file with the clerks' office; it was filed as an attachment to the complaint.

expert testimony and that Sheriff has not been designated as an expert. (Resp. SAMF ¶ 153.)

They also deny the statement by citing to Paragraphs 3 and 4 of the Hobbs Affidavit, without

bothering to explain the nature of the denial. (Id.)  The two cited affidavit statements are that

Hobbs was in Control when Harriman fell and hit his head and that after she was notified by a

supervisor to call an ambulance, she immediately did so.  (Hobbs Aff. ¶ 3-4.) There is no dispute

that Sheriff was only told that Harriman had cut his forehead when he fell earlier in the evening.

(SAMF ¶ 154; Resp. SAMF ¶ 154 (admit); Sheriff Aff. ¶10.)

According to Harriman, the room that Sheriff visited to attend to Mr. Harriman is

identified as SH secure holding. It is in the Booking Room next to the exit door to the Sallyport.

(SAMF ¶ 155; Sheriff Aff. ¶12.)  Harriman was naked when Sheriff attended him. (SAMF ¶ 156;

Sheriff Aff. ¶ 13.)  There was no robe or suicide smock in his cell. (SAMF ¶ 157; Sheriff Aff.

¶14.)  Sheriff does not recall being told that Harriman had had several seizures immediately prior

to her arrival at the Hancock County Jail. (SAMF ¶ 158; Sheriff Aff. ¶16.)  The defendants

respond with unexplained citations to deposition testimony.  (See Resp. SAMF ¶¶ 155-57.) [15] In

the referenced section of the Haines Deposition, he testifies that he placed Harriman in "HD-I"

not SH secure holding.  (Haines Dep. at 42.)  Haines testified that Harriman was in a suicide

smock at the time he heard the thump. (Id. at 70-71.)  Pileski testified that Haines and he took

Harriman to HD-1 and nowhere else.  (Pileski Dep. at 19, 31, 37.)

### b.    *Foster Kane Affidavit Dependant Additional Statements*

Foster Kane was an inmate at the Hancock County Jail on the weekend of October 20,

2006.  (SAMF ¶ 159; Kane Aff. ¶1.)   At some point in time in the evening, Foster Kane became

---

[15]     The defendants do not have a statement responsive to Paragraph 158.

aware of a loud commotion in the Booking Area, which is adjacent to Cell Block A where he

was housed. (SAMF ¶ 160; Kane Aff. ¶¶ 2-6.)  He could tell from the shouting and the cries of

pain that a beating was taking place (SAMF ¶ 161;  Kane Aff. ¶¶ 2-6); he could tell from the

yelling and screaming and loud thuds that a beating was taking place. (SAMF ¶ 162); Kane Aff.

¶¶ 4-6. ). The disturbance went on for approximately 45 minutes before the (unidentified)

correction officers dragged David Harriman into his cell block.  (SAMF ¶ 163;  Kane Aff. ¶ 7.)

Harriman looked beat up and he was acting very strange. (SAMF ¶ 164; Kane Aff. ¶¶ 8-9.)

Harriman's face was bloody and his eyes were swollen. (SAMF ¶ 165; Kane Aff. ¶11.)

Harriman was very afraid the guards were going to beat him up again. (SAMF ¶ 166; Kane

Affidavit ¶12.)  Harriman's condition worsened throughout the next day and Kane repeatedly

complained to the guards that Harriman needed to see a doctor.  (SAMF ¶ 167; Kane Aff. ¶¶ 14-

15.)  Harriman's response to the defendants' request that the affidavit and dependant statements

of fact be stricken reveals for the first time that Kane is a first cousin of Harriman's wife,

Danielle Harriman. (Pl.'s Opp'n Request Strike at 2.)

## C.   *THE CLAIMS*

### 1.   **Constitutional Claims**

#### a.   *Custom and Policy and Failure to Train Claims*

As an initial matter there is no doubt that Harriman has failed to create a genuine dispute

of fact material to his assertion that Hancock County can be held liable on a theory of municipal

liability for a custom or policy that led to a constitutional violation.  He has ignored the trees for

the forest.

Harriman has also not carried this burden apropos his attempts to hold Sheriff Clark

responsible as a supervisor for a failure to train. Captain Dannenberg's ignorance of certain

protocols does not on its own justify an inference that the personnel involved with Harriman during the time in question were not adequately trained.  The key assertion is that "Hancock County Jail does not train their employees in use of force, they leave it up to the Maine Criminal Justice Academy." (Resp. Mot. Summ. J. at 11.)  Harriman goes on: "Herein, Plaintiff's expert has raised the issue that the failure to train is commensurate with the failure to discipline, in effect, the failure to supervise. As a result, in Hancock County, while Captain Dannenberg, the Jail Administrator sleeps, i.e. no discipline is imposed; the guards run the institution."  (Id. at 12.)[16]

Both theories – custom and policy and failure to train --  require "proof of deliberate indifference. And just as proof of a custom or practice requires more than a showing of isolated acts, proof of deliberate indifference, generally requires a showing 'of more than a single instance of the lack of training or supervision causing a violation of constitutional rights.'" Burge v. St. Tammany Parish, 336 F.3d 363, 370 (5th Cir. 2003) (quoting Thompson v. Upshur County, 245 F.3d  447, 459 (5th Cir. 2001)). "Rather, deliberate indifference generally requires that a plaintiff demonstrate 'at least a pattern of similar violations' arising from training that is so clearly inadequate as to be 'obviously likely to result in a constitutional violation.'" Id. (quoting

---

[16]     In his responsive memorandum, Harriman sets forth the following aspects of the Dannenberg deposition:
Page 59, Lines 13-14 excessive force notice of claim on Joanie Banks;
Page 59, Line 21, excessive force notice of claim on Ron Eaton;
Page 62, Lines 2-4 Use of force taught at the Police Academy not at Hancock County Jail;
Page 63, Lines 14 The system of discipline is in the union contract;
Page 63, Lines 16  Have to look at the union contract to know what it is;
Page 64, Lines 4-5 Dannenberg is not familiar with discipline procedures;
Page 64, Line 7 He has no disciplinary step procedures;
Page 64, Line 11 He doesn't know who is responsible for discipline;
Page 64, Line 16 He doesn't know if there is an internal investigation procedure at the jail;
Page 64, Line 22 He doesn't know if his Lieutenants are responsible for internal investigations;
Page 66, Lines 20-21 Dannenberg, however, believes he is in control of discipline;
Page 66, Line 25 No one was disciplined as a result of the Harriman incident.
(Resp. Mot. Summ. J. at  12.)

Thompson, 245 F.3d  at 459.) See also Buchanan ex rel. Estate of Buchanan v. Maine, 417 F.Supp.2d 45, 63 -71 (D. Me. 2006).

I also note with respect to Harriman's insistence that there is no evidence that the correctional officer defendants received adequate training on the use of force, that he is claiming a completely unwarranted drumming occurred;[17] this is not the kind of theory of liability for which a training in, say, the proper escalation of force would circumvent.  See  Carr v. Castle, 337 F.3d 1221, 1232 (10th Cir. 2003) ("Even if Carr is viewed from the most favorable perspective in terms of the Officers not having been trained to know how to react exactly to an individual who had just thrown a four-inch piece of concrete, one thing is certain: They were not trained by the City to shoot him repeatedly in the back after he no longer posed a threat. In sum, even if some inadequacy in training had been shown, Carr cannot demonstrate how it was a direct cause of the Officers' actions and of Randall's consequent death."); Andrews v. Fowler, 98 F.3d 1069, 1077 (8th Cir. 1996) ("In light of the regular law enforcement duties of a police officer, we cannot conclude that there was a patently obvious need for the city to specifically train officers not to rape young women."); see cf. Hayden v. Grayson, 134 F.3d 449, 457 n 14 (1st Cir.1998).  The Foster Kane affidavit is particularly telling on this score.  According to Kane's affidavit (and Harriman's theory of the case), a group of corrections officers congregated in a small room simply to beat up on Harriman until they decided he had enough.   It is not a case where Harriman is alleging the officers were inadequately trained in the use of a weapon, such as a taser, or a particular technique, such as escorting a shackled prison on cement walkways.  Harriman's theory is that a gang of thugs beat him up.  Neither the Maine Criminal Justice

---

[17]        This is his theory when it comes to his excessive force claim; when it comes to his tort claim for negligence/assault he actually represents that it "is in a sense an unexplained accident." (Resp. Mot. Summ. J. at 16.)

Academy nor Hancock County, even with Dannenberg's incompetence, ever provided training that involved a gang beating of unarmed, helpless prisoners. Harriman has presented no record evidence as to how the training the officers received would have been causally connected to the beating he says he received.

Furthermore, without an underlying constitutional violation Hancock County and Clark (on a supervisory theory or in his official capacity) cannot be held liable on a policy and custom or failure to train theory. See Wilson v. Town of Mendon, 294 F.3d 1, 6 -7(1st Cir. 2002); see also Bowman v. Corrections Corp. of America, 350 F.3d 537, 544-47 (6th Cir. 2003). The discussion below reflects my conviction that Harriman does not survive summary judgment apropos his substantive counts.

### b.        Count I - Unreasonable Search and Seizure

The only way to construe Count I – labeled "Unreasonable Search and Seizure" - is as an unconstitutional force claim pertaining to a pre-trial detainee. As the defendants point out, when it comes to pre-trial detainees there is some uncertainty as to the dividing line between the applicability of the Fourth Amendment excessive force standard and the Eighth Amendment cruel and unusual punishment prohibition. The defendants cite to Bozeman v. Orum, 422 F.3d 1265, 1271 (11th Cir. 2005) for the proposition that the standards applicable to pre-trial detainees and convicted inmates are fungible and that the Eighth Amendment prohibition against cruel and unusual punishment applies to this claim.

I explored this concern in Dickinson v. Purinton, and concluded, "that the standard to apply must include both the intent to punish and an objective evaluation of the reasonableness of the conduct." Civ. No. 06-209-P-S, 2007 WL 2343650, 2 -4 (D.Me. Aug. 3, 2007) (recommended decision), aff'd, 2007 WL 2473884. There I followed the standard for restrictions

and conditions claims by a pre-trial detainees outlined in O'Connor v. Huard, 117 F.3d 12 (1st

Cir.1997) and relied on Judge Hornby's  pattern instruction, "Excessive Force in Violation of the

Fourteenth Amendment; Use of Excessive Force that Amounts to Punishment." Dist. Me. Pattern

Jury Inst. 3.1 (Hornby, J.).[18]

---

[18]     Judge Hornby has updated this instruction, bearing the overall title of "Pattern Instructions for Cases of Excessive Force in Violation of the Fourth, Eighth and Fourteenth Amendments."  In the section entitled "Pretrial detainees: Use of Excessive Force (Fourteenth Amendment)" there is a jammed-packed footnote that observes the perplexity of the issue:

     This instruction is for excessive force claims brought by pretrial detainees. The standard applicable to pretrial detainees' claims for excessive force is an unsettled question of law across the country. Wilson v. Spain, 209 F.3d 713, 715 (8th Cir. 2000) (stating that the standard applicable to an excessive force claim brought by a pretrial detainee is ―something of a legal twilight zone). The Fourth Amendment applies to claims of excessive force in the context of an arrest or investigatory stop of a free citizen, Graham v. Connor, 490 U.S. 386, 394 (1989), see also Instruction 1.1, but the Supreme Court ―ha[s] not resolved the question whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins. Graham, 490 U.S. at 395 n.10. It is well settled that once criminals are convicted and serving their sentences, the Eighth Amendment applies, Whitley v. Albers, 475 U.S. 312, 318 (1986); see also Instructions 2.1 and 2.2, and that pretrial detainees are entitled to due process protections ―at least as great as those under the Eighth Amendment protections available to a convicted prisoner.‖ Sacramento v. Lewis, 523 U.S. 833, 849-50 (1998) (quoting City of Revere v. Mass Gen. Hosp., 463 U.S. 239, 244 (1983)). The unsettled question is what standard applies after Fourth Amendment protection ends (when that occurs is part of the Circuit split) and before Eighth Amendment protection begins (serving a sentence after conviction). See Bozeman v. Orum, 422 F.3d 1265, 1271 (11th Cir. 2005) (stating that although claims brought by pretrial detainees are governed by the Fourteenth Amendment instead of the Eighth Amendment, ―it makes no difference . . . because 'the applicable standard is the same') (quoting Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996)); Phelps v. Coy, 286 F.3d 295, 300–01 (6th Cir. 2002) (applying the Fourth Amendment where the plaintiff was still in custody of the arresting officer and was never incarcerated); Wilson, 209 F.3d at 715-16 (applying the Fourth Amendment to an arrestee who had been booked and placed in a detoxification cell); Fuentes v. Wagner, 206 F.3d 335, 346-47 (3d Cir. 2000) (applying the Eighth Amendment in the context of pretrial detainee involved in a prison disturbance); United States v. Walsh, 194 F.3d 37, 47-48 (2d Cir. 1999) (applying an Eighth Amendment standard to claims brought by pretrial detainees under the Fourteenth Amendment); Taylor v. McDuffie, 155 F.3d 479, 483 (4th Cir. 1998) (holding that the Fourteenth Amendment governs claims brought by pretrial detainees but applying a standard――unnecessary and wanton pain and suffering‖――associated with Eighth Amendment claims) (quoting Whitley, 475 U.S. at 320).

     The First Circuit has not clearly decided the issue. In Burrell v. Hampshire County, it applied Eighth Amendment analysis to a claim brought against prison officials for deliberate indifference to the health and safety of a pretrial detainee who had been assaulted by other inmates, stating that ―the Due Process Clause protections are at least as great as those under the Eighth Amendment. 307 F.3d 1, 7 (1st Cir. 2002) (citing Bell v. Wolfish, 441 U.S. 520, 545 (1979)); accord Calderon-Ortiz v. Alvarado, 300 F.3d 60, 63-64 (1st Cir. 2002). In Davis v. Rennie, it approved using the Fourth Amendment ―objective reasonableness standard for an excessive force claim brought by an involuntarily committed mental patient. 264 F.3d 86, 108 (1st

According to Judge Hornby's instruction, in order for Harriman to ultimately prove a "claim of unconstitutionally excessive force used to punish," he "must prove by a preponderance of the evidence" that the defendants "intentionally, rather than negligently, used excessive force" and  "that the use of excessive force against [Harriman] was for the purpose of punishment." "It is not necessary to find that [the defendants] knew that punishing [Harriman] would deprive [Harriman] of [his] constitutional rights in order to find in favor of [Harriman]. [Harriman] is entitled to relief if [the defendants] intentionally used excessive force for the purpose of punishment against [Harriman]." Dist. Me. Pattern Jury Inst. 3.1 (Hornby, J.) (updated Oct. 29, 2007) at 15 (footnotes omitted).[19]

Clearly if Harriman has met his burden of creating a genuine dispute of material fact on his theory that he was deliberately beaten by the guards by providing competent evidence of this theory, a trial would be necessary on this count.  However, I have determined that the Kane Affidavit must be stricken because Harriman has in no way demonstrated a justification for his

Cir. 2001). In O'Connor v. Huard, 117 F.3d 12 (1st Cir. 1997), it approved Fourteenth Amendment substantive due process analysis for a pretrial detainee's claim concerning conditions of confinement: Prior to an adjudication of guilt . . . a state government may not punish a pretrial detainee without contravening the Fourteenth Amendment's Due Process Clause. The government may, however, impose administrative restrictions and conditions upon a pretrial detainee that effectuate his detention, and that maintain security and order in the detention facility. When confronted with a charge by a pretrial detainee alleging punishment without due process, the —court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Id. at 16 (citations omitted) (quoting Bell, 441 U.S. at 538). In Cummings v. McIntire, 271 F.3d 341 (1st Cir. 2001), it also applied substantive due process principles for claims of excessive force by a police officer outside the context of a Fourth Amendment seizure. In the face of this complexity, this pattern instruction follows the statement in Graham v. Connor (—the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment), the principles of O'Connor v. Huard (a pretrial conditions-of-confinement case), and the —objective reasonableness test applied in Davis v. Rennie. But the law is hardly well-settled.
Dist. Me. Pattern Jury Inst. 3.1 (Hornby, J.) (updated Oct. 29, 2007) at 15 n.1.

[19]     Harriman, however, was not really a detainee in the sense that he was awaiting trial – he was an arrestee awaiting bail, compare Clarke v. Blais, Civil No. 5-177-P-H, 2006 WL 3691478 (D.Me.2006) (recommended decision), rev'd on other grounds, 473 F.Supp.2d 124 (D.Me.2007), so there is a substantial argument that the Fourth Amendment standard for excessive force should apply to this claim. See Graham v. Connor, 490 U.S. 386 (1989). Ultimately it makes no difference in the outcome of this case because of Harriman's failure of proof that any of these defendants used any force against him.

late disclosure (and tardy efforts to investigate).   The Sheriff Affidavit also is stricken, but even if it were not, this evidence would not be sufficient to carry Harriman's burden of providing a dispute of fact that justifies sending this count to trial. Mitchell's and Sheriff's reports about viewing Harriman at the jail do not create a triable issue on the question of whether or not Harriman was subject to an unconstitutional application of force.  Nor does Harriman's rather vague recollection that he heard hollering, echoes of hollering, flashes of light, someone saying "he's had enough or I think that's enough or maybe even that's enough," someone saying they were going to take him to Augusta, smelling urine mixed with cleaning fluid and seeing his wife's cousin. Harriman admits that he has no more recollection of the events in question than this.

Therefore, as the record stands and must stand, there is no dispute that Harriman has no memory of any specific corrections officers that he may have encountered or interacted with at the Hancock County Jail on October 20, 2006, and he has no memory of where he went or where he was taken in the jail on October 20, 2006, until his release. Harriman does not remember being struck by anybody at the Hancock County Jail from the time of his admission on October 20, 2006, until the time of his release from jail. Harriman does not recall being struck by any object used or wielded or held by anybody at the Hancock County Jail from October 20, 2006, until the time of his release from jail.  Harriman does not remember falling and striking his head on a wall or floor at the Hancock County Jail at any time between October 20, 2006, and the time of his release.  Harriman does not know what caused the injuries he sustained at the Hancock County Jail. Harriman tries to suggest that there was not a sufficient monitoring of him for being a suicide risk but he has no evidence that intentions of suicide played any part in his injuries.  He seems to want to leave dangling in the air the question of whether or not he was deliberately

beaten or had self-inflicted wounds from his suicidal tendencies to which the defendants were deliberately indifferent. (See supra footnotes 6 & 8 .)  Although it is part of the factual terrain that Harriman does try to place into dispute, he never does explain how the question of whether or when he had a suicide vest on ties in to this claim.

In his response to the defendants' request to strike he articulates his evidentiary theory as follows:

> Plaintiff was lulled into a false sense of inevitability that he would be unable to find anyone other than Trooper Mitchell to discount the various Defendants' reports that the Plaintiff had been stripped and placed in a suicide smock and placed in the interior holding cells of the jail identified as HD1. Of course, Trooper Mitchell's Deposition indicates that Plaintiff was housed in the Secured Holding Cell in the Booking Room, which coincidentally is right next to Cell Block A, and was fully clothed almost a full hour after Defendants' claim Plaintiff had been led into the interior of the Jail by the correction officer Defendants.

(Pl.'s Resp. Request Strike at 2-3.)  Clearly there is some discrepancy in the evidence on this point, but what does that discrepancy prove in terms of how the injuries were received, except that apparently there weren't any visible injuries when Mitchell left the jail.[20]

The bottom line is that Harriman concedes that he has no way of identifying which defendant did what if anything to him.[21] The First Circuit explained in Gutierrez-Rodriguez v. Cartagena:

> Section 1983 imposes liability upon those who "subject[ ] or cause[ ] to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws...." This circuit has expanded upon the express words of the statute and stated that:

---

[20]       The injuries could just as easily have happened the way the officers testified as the way Harriman "theorizes."  A jury would have to decide the case based on evidence and there is none.

[21]       There is no dispute that Defendants Richardson and McCarty had no involvement with Harriman before the following day, October 21, 2006.

> A person "subjects" another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an affirmative act which he is legally required to do, that causes the deprivation of which complaint is made. [Citation omitted.] Moreover, personal participation is not the only predicate for section 1983 liability. Anyone who "causes" any citizen to be subjected to a constitutional deprivation is also liable. The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.

Springer v. Seaman, 821 F.2d 871, 879 (1st Cir.1987) (quoting Soto v. City of Sacramento, 567 F. Supp. 662, 673-74 (E.D.Cal.1983) (citations omitted) and Johnson v. Duffy, 588 F.2d 740, 743-44 (9th Cir.1978)). The Springer court also noted that inquiries into causation under § 1983 are cabined within common law tort principles. See id. at 876-79; see also Memphis Community School Dist. v. Stachura, 477 U.S. 299, 305-06 (1986) (noting that common-law principles control the issuance of damages under § 1983).

882 F.2d 553, 560 -561 (1st Cir. 1989).   In that case the Panel addressed a challenge to a jury verdict against members of the Carolina Drugs and Narcotics Division of the Police Department of Puerto Rico assigned to do "'preventive rounds'" apropos drug trafficking. Id. at 557.  On the night in question, an unmarked police car containing the defendants "came upon Gutierrez' vehicle … quickly exited their vehicle and approached the car with guns drawn." Id.  "Upon seeing unidentified men brandishing firearms approaching his car, Gutierrez hastily started his engine and began to drive away. Without warning, the officers began to fire at the car. One bullet struck Gutierrez in the back …causing him to become a paraplegic-permanently paralyzed from the waist down." Id.  There was no question in that case about the timing and source of the plaintiff's injuries and that there had been an application of force by the police officers on patrol. Thus, if the record established that the source of Harriman's injuries was a beating, there might have been a theory of liability as to some of these named defendants.  That connection is missing in this case.

35

Although the Ninth Circuit distinguished its analysis in <u>Jones v. Williams</u> from

<u>Gutierrez-Rodriguez</u>, <u>see</u> 297 F.3d 930, 938 (9th Cir. 2002), it made clear that a plaintiff in shoes

similar to Harriman's must be able to tie each defendant he or she seeks to hold liable to the

conduct in question.  Vis-à-vis the plaintiff's theory of "team liability," the Panel explained:

> In <u>Chuman v. Wright</u>, we defined the contours of individual liability
> further when we stated a plaintiff could not hold an officer liable because of his
> membership in a group without a showing of individual participation in the
> unlawful conduct. 76 F.3d 292, 294 (9th Cir.1996). <u>Chuman</u> does not appear to
> bar any use of a group liability instruction, but does seem to require the plaintiff
> to first establish the "integral participation" of the officers in the alleged
> constitutional violation. <u>Id.</u> (quoting <u>Melear v. Spears</u>, 862 F.2d 1177, 1186 (5th
> Cir.1989)) (internal quotations omitted). <u>Chuman</u> clearly states that a "team
> liability" instruction that does not require any individual liability:
>> is an improper alternative grounds [sic] for liability. It removes individual
>> liability as the issue and allows a jury to find a defendant liable on the
>> ground that even if the defendant had no role in the unlawful conduct, he
>> would nonetheless be guilty if the conduct was the result of a "team
>> effort."
> <u>Id.</u> at 295.

<u>Id.</u> at 935; <u>See</u> also <u>Goings v. Chickasaw County</u>, No. 06-CV-2063-LRR, 2008 WL 686917, 7

(N.D. Iowa Mar. 10, 2008).  Harriman rests his entire case on the notion that there is something

suspect in the discrepancy between the reports as to where Mitchell and Sheriff thought

Harriman was being held and where the correctional officers, who are the individuals actually

knowledgeable about the designations of the areas of the jail, testified that Harriman was held

and observed. He also makes the rather bald assertion that the logs cannot be trusted.  This is far

too thin a reed upon which to rest a count or a case.[22]

> c.      *Count VII-Due Process*

Count VII is framed as a due process claim brought pursuant to the Fourteenth

Amendment.  The initial pleading of this claim is as follows:

---

[22]       Or an opposition to a request to strike.

99. Plaintiff has a liberty interest in his bodily integrity.
100. The Defendants did, acting under color of law in their official capacities, and individually, violate that right.
101. The Defendants, each of them in their official capacities and individually, caused the Plaintiff harm by that said violation.
102. The Defendants, each of them in their official capacities, and individually, were deliberately indifferent to the rights of the Plaintiff under the Fourteenth Amendment of the United States Constitution providing him rights of due process to bodily integrity.
103. Further, the Defendants were deliberately indifferent to the Plaintiff's serious medical needs.
104. The Defendants failed to call for an ambulance for over two hours, though the Plaintiff suffered from convulsions and vomiting as a result of the beating administered by the Defendants.
105. Such deliberate indifference also violated the Plaintiff's right to due process under the Fourteenth Amendment to the United States Constitution.

(Compl. ¶¶ 99-105.)

In his response brief Harriman does not explain his "due process" theory but he does speak of deliberate indifference to his need for medical attention.[23] The Eighth Amendment prohibition against cruel and unusual punishment protects pre-trial detainees to the same, or greater extent, as it does convicted inmates.  See Burrell v. Hampshire County, 307 F.3d 1, 7 (1st Cir. 2002) (citing Bell v. Wolfish, 441 U.S. 520, 545 (1979)); accord Calderon-Ortiz v. LaBoy-Alvarado, 300 F.3d 60, 63-64 (1st Cir. 2002). With respect to the Eighth Amendment deliberate indifference standard in the context of medical care for inmates, the First Circuit summarized in Ruiz-Rosa v. Rullan:

> For medical treatment in prison to offend the Constitution, the care "must involve 'acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.' " Feeney v. Corr. Med. Servs., Inc., 464 F.3d 158, 161 (1st Cir.2006) (quoting Estelle v. Gamble, 429 U.S. 97, 105-06 (1976)). Deliberate indifference in this context may be shown by the denial of needed care as punishment and by decisions about medical care made recklessly with "actual knowledge of impending harm, easily preventable." Id. at 162 (internal quotation

---

[23]     The defendants have briefed the complaint as if it contained a deliberate indifference count.

marks omitted). Deliberate indifference means that "a prison official subjectively 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " Burrell [v. Hampshire County], 307 F.3d [1,] 8 [(1st Cir. 2002)](quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). Therefore, substandard care, malpractice, negligence, inadvertent failure to provide care, and disagreement as to the appropriate course of treatment are all insufficient to prove a constitutional violation. Feeney, 464 F.3d at 161-62.

485 F.3d 150, 156 (1st Cir. 2007).

"'Deliberate indifference' thus defines a narrow band of conduct in this setting." Feeney, 464 F.3d at 162.   "The care provided must have been '"so inadequate as to shock the conscience." '" Id. (quoting Torraco v. Maloney, 923 F.2d 231, 235 (1st Cir.1991), in turn quoting Sires v. Berman, 834 F.2d 9, 13 (1st Cir.1987)).

Harriman simply has not created a plausible basis for inferring that the defendants delayed calling an ambulance for over two hours to justify sending this case to trial. There is no cognizable record evidence whatsoever that there was such a delay. Harriman does not dispute that Correction Officer Ryan Haines reported seeing Harriman unconscious at 2220 hours and reported that he saw Harriman have a seizure at 2222 hours. At 2224 Harriman had another seizure and Haines reported that the County Ambulance arrived at 2227 hours and took over care of Harriman.  Now, according to Harriman, although Correction Officer Haines found Harriman unconscious at 2220 and saw two short seizures between then and the time the County Ambulance arrived at 2227, Correction Officer Haines failed to report to the Emergency Medical Technicians that Harriman had experienced seizure behavior and Correction Officer Michael Pileski also noticed seizure behavior, in his report he indicated that each seizure lasted 20 seconds and he, too, failed to report the seizure behavior to Sheriff.  There is no dispute that Sheriff was only told that Harriman had cut his forehead when he fell earlier in the evening.

38

However, there is no record support for a conclusion that this failure to tell Sheriff of the seizures was of any consequence to Harriman's care from there on out.  The injuries he is complaining of are those documented by the pictures and which he maintains were sustained while he was at the jail.

Even if Danielle Harriman's first cousin Foster Kane was to testify per his affidavit, he only speaks to allegations that the following day – after Harriman's initial transport to the hospital – he was concerned about Harriman's need for medical attention.  The facts are as to the following day, October 22, 2006, Harriman complained of seeing black spots that were getting bigger and he was seeing double vision. McCarty paged Physician's Assistant Blackadar for medical advice. Blackadar returned the call and advised that Harriman should be placed on medical watch and be watched for vomiting and if Harriman did vomit he should be taken to the hospital. Harriman was moved into HD-2 and placed on medical watch. McCarty briefed the oncoming shift that PA Blackadar had stated that if Harriman began vomiting he would need to be taken to the hospital. In the early evening on October 22, 2006, there was concern that Harriman may have vomited and he was taken to Maine Coast Memorial Hospital.  Harriman was returned from the hospital later that evening.  These facts do not make out a deliberate indifference claim.

### d.    *Counts  V- Conspiracy 42 U.S.C. § 1983*

Harriman's 42 U.S.C. § 1983 conspiracy theory runs thusly,

Here, there is sufficient evidence for a jury to decide that the officers engaged in a conspiracy to deprive Plaintiff of a right secured by the Constitution. His right to be free from excessive force. If the EMT, Jenny Sheriff, is believed, then the officers have engaged in a cover up to deny Plaintiff rights secured by the Constitution. At summary judgment, "[The] evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The evidence before the Court at

this stage in the proceedings i.e., in opposition to motion for summary judgment, establishes that Defendants engaged in a conspiracy to deprive Plaintiff of his Section 1983 rights to seek redress for the alleged violations.

(Resp. Mot. Summ. J. at 15.)

I have already concluded that the defendants are entitled to summary judgment on the unconstitutional force and 'due process'/deliberate indifference claims that could be the only underlying constitutional rights implicated by this civil rights conspiracy count. The defendants are, therefore, entitled to judgment on this conspiracy claim.  See e.g., Curley v. Village of Suffern, 268 F.3d 65, 72 (2d Cir. 2001)("Since plaintiff cannot establish a claim for false arrest or the use of excessive force, he may not maintain a § 1983 cause of action for conspiracy.").

## 2.    Remaining Counts[24]

In their reply memorandum the defendants have argued that the only argument made in defense of Harriman's state law claim pertains to the individual capacity claims premised on an argument of res ipsa loquitur (Count VIII discussed below) and that Harriman has waved any state law claims against them in their official capacity.  (Reply Mem. at 10.)  They are entitled to such a conclusion.  The following discussion is brief.

### a.     Count III – Intentional Infliction of Emotional Distress

---

[24]     With respect to Harriman's Maine Tort Claim Act counts, there is no contest that the Maine County Commissioners Association Self-Funded Risk Management Pool (Risk Pool) is a public self-funded pool established pursuant to 30-A M.R.S.A. ch. 117. Hancock County is a Named Member of the Risk Pool and is provided with insurance type coverage pursuant to a document entitled "Maine County Commissioners Association Self-Funded Risk Management Pool Coverage Document" ("Coverage Document"). The Coverage Document specifically excludes any coverage for any cause of action seeking tort damages for which the County is immune pursuant to the Tort Claims Act, and limits coverage to those areas for which governmental immunity is expressly waived by the Tort Claims Act.  Other than the insurance-type coverage provided to Hancock County under the Risk Pool's Coverage Document, Hancock County has not procured insurance against liability for any claim against the County or its employees for which immunity is not otherwise waived under the Maine Tort Claims Act.

Harriman does not address his Count III intentional infliction of emotional distress claim in his responsive memorandum.  His allegations are:

> 88. The conduct of the Defendants, each of them individually and in their official capacities, was intentional, malicious, reckless, and deliberate.
> 89. As a direct and proximate result of said intentional, deliberate, and reckless conduct of the Defendants, each of them, the Plaintiff was caused to suffer severe emotional and physical distress, humiliation and mental anguish, all as more particularly set forth herein above.
> 90. The conduct of the Defendants was so reckless, deliberate, and outrageous, as to be beyond all bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized society.

(Compl. ¶¶ 88-90.)

It would be more than fair to treat his argument in defense of this count as waived. However, taking this as a preserved claim under the Maine Tort Claims Act, as already noted, the First Circuit  "inquiries into causation under § 1983 are cabined within common law tort principles." Gutierrez-Rodriguez, 882 F.2d at 561.  My previous conclusion that Harriman has not created a triable issue as to the question of whether any of these defendants caused him any injury, whether with regards to their alleged use of force or the response to his medical needs, also means that Harriman cannot go forward on this count.

### b.   *Count VIII-Negligence/Assault*

Lumping in one count, two contradictory theories of conduct, Count VIII is pressed under the Maine Tort Claims Act seeking remedy for negligence or assault. For his argument Harriman relies on Pepin v. Wal-Mart Stores, 542 F.Supp.2d 107, 111 (D. Me. 2008):

> Plaintiff has vague recollections of what happened to him. (I heard someone say "He's had enough." David Harriman Affidavit ¶ 1.) It is in a sense an unexplained accident. Defendants argue that this lack of evidence is fatal. Yet, such arguments, in fact, support the "unexplained portion of this first prong of the res ipsa loquitur doctrine." Pepin at 112. Next, clearly the Jail is under the management and control of the Defendants and "In the ordinary course of events, this type of accident does not happen absent negligence." Pepin at 112. Finally,

"the character of this accident, in terms of the negligence analysis context and negligence claim is not the type of accident which would have occurred absent negligence." <u>See</u> <u>Pepin</u> at 112-113. As a result, as in <u>Pepin</u>, so here, Defendants should be denied their motion for summary judgment on Plaintiff's Tort Claims of negligence.

(Resp. Mot. Summ. J. at 16.)

Assuming that this count, too, does not fail for the inability of Harriman to link a particular tort feasor to his injury, without an expert opinion making a plaintiff's verdict conceivable or <u>plausible</u>, this count cannot proceed.  Harriman apparently intended to name Dr. Lash as an expert but she testified in her deposition that she could not give crucial opinion testimony on the source of his injuries. The court will not be coaxed into pure speculation that these injuries were in fact sustained at the jail by a beating as opposed to some other place or other source of injury.  Mitchell had difficulty getting Harriman into the cruiser and had to strike him to get him into the cruiser.  Harriman insists that he had more than one fit prior to his transport to the hospital on the night of his arrest.  Harriman has indicated that Lash is his expert in responding to the request to strike but he has clearly not designated her as such in the course of discovery.

I reiterate, Harriman is relying on the thinnest reeds in relying on Mitchell's deposition testimony and even the stricken affidavit of Sheriff vis-à-vis their belief that Harriman may have been in a different cell than the holding cells to try and get the court to infer that there was a system-wide cover-up of his mistreatment or a negligence of his personal safety at the jail.

### c.      *Count VI – Punitive Damages*

The resolution of the punitive damages count flows from the Court's conclusion vis-à-vis the other aspects of this recommended decision.  It is true that "the standard for punitive damages on a federal civil rights claim is not demanding, requiring only that the defendant 'acted with

"evil motive or intent" or with "reckless or callous indifference" to the plaintiff's federally protected rights.'" <u>E.E.O.C. v. DCP Mistream, L.P.</u>, __ F. Supp. 2d __, __. 2009 WL 782973, 1 (D. Me. Mar. 25, 2009) (quoting <u>Danco, Inc. v. Wal-Mart Stores, Inc.</u>, 178 F.3d 8, 17 (1st Cir. 1999), quoting <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983).)  However, to justify punitive damages there must be an underlying basis for liability and I have concluded that the defendants are entitled to judgment on all of Harriman's substantive counts.

## <u>Conclusion</u>

For these reasons I recommend that the court grant this motion for summary judgment as to all of Harriman's claims against Defendants Hancock County, William Clark, Ryan Haines, Heather Sullivan, Michael Pileski, Karen McCarty, and Troy Richardson.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

March 31, 2009.